**GENERAL BATTERY CORPORATION, Plaintiff,**

v.

**GOULD, INC., Defendant.**

**GOULD, INC., Plaintiff,**

v.

**GENERAL BATTERY CORPORATION, Defendant.**

**Civ. A. Nos. 76–162, 77–73.**

United States District Court, D. Delaware.

July 19, 1982.

Paul E. Crawford, Connolly, Bove & Lodge, Wilmington, Del., for General Battery Corp., Frank J. Benasutti, and Eric S. Marzluf, Benasutti Associates, Ltd., Philadelphia, Pa., of counsel.

John G. Mulford, Theisen, Lank, Mulford & Goldberg, P. A., Wilmington, Del., for Gould, Inc.; Phillip H. Mayer, and Gordon R. Coons, Leydig, Voit, Osann, Mayer & Holt, Ltd., Chicago, Ill., of counsel.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This is a consolidated action to determine whether two patents held by Gould, Inc. ("Gould") are valid and infringed. On May 6, 1976, General Battery Corporation ("GBC") filed Civil Action No. 76–162 in this Court, seeking a declaratory judgment as to the invalidity and non-infringement of Gould's product patent, U. S. Letters Patent No. 3,948,680 (" '680 patent"). On March 1, 1977, Gould filed Civil Action No. 77–73, alleging that GBC and Northwest Industries, Inc. had infringed the '680 patent and the subsequently-issued method patent, U. S. Letters Patent No. 3,988,165 (" '165 patent"). The two cases were consolidated by Court Order on October 3, 1977. Docket No. 53. Gould later dropped its claims against Northwest Industries, Inc. Docket No. 191.[1] The case was tried to the Court from November 30, 1981, to December 8, 1981, and the Court heard post-trial argument on April 30, 1982. Jurisdiction is based on 28 U.S.C. § 1338(a) and venue is proper under 28 U.S.C. § 1400(b). This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

---

1. The parties filed amended pleadings in October, 1981, to reflect this change. *See* Docket

Nos. 234, 235.

## I. *Background Facts*

### A. *Batteries Generally*

The patents at issue claim both a method for manufacturing automotive batteries and the batteries themselves. The Gould batteries manufactured under the method at issue are known as "Drynamic"; the GBC batteries alleged to infringe are known as "Redi Dri." (PreTrial Order 1(a)(1)e.)[2] The process at issue became a commercial reality in the early 1970's. Batteries manufactured under this process are available commercially today.

Some background information on batteries must be set forth to place the case in context, although this discussion is necessarily oversimplified. Batteries generally are divided into two categories—primary or voltaic batteries, and secondary or storage batteries. Each type converts chemical energy which had been stored in the battery when it was charged into electrical energy. During this process, known as "discharge," chemical reactions occur within the battery which release electrons on the negative electrode. A primary battery is simply discarded after the reactants are exhausted. A secondary or storage battery, on the other hand, converts chemical energy into electrical energy by reactions that are essentially reversible; the battery may be recharged by passing a current through it in the opposite direction to that of its discharge.

At issue in this case are lead-acid storage batteries. Lead-acid storage batteries are composed of plates, which are grids with lead compound material pasted on them, and a solution of sulfuric acid and water called "electrolyte." When the battery is initially charged, a current which passes through the plates transforms them into either positive or negative plates by rendering the inert lead compound material "active." The active material on the positive plates is lead dioxide; the active material on the negative plate is spongy lead. At discharge, the sulfuric acid reacts with this active material to form lead sulfate and water and release electrical energy.[3]

An automotive battery is simply a six or twelve-volt lead-acid battery that is used to start an automobile engine. (Tr. 103). Among battery manufacturers these batteries are often termed "starting, lighting, and ignition" or "SLI" batteries. (Tr. 103). Unlike industrial batteries[4] or golf cart batteries, which normally use from fifty to one hundred percent of their capacity during operation, an automotive battery usually uses less than five percent of its total capacity to start an engine. (Tr. 110). In addition, an automobile battery is recharged while the engine is running. When the battery is in a state of overcharge, as is the ordinary case while driving, the electrical current from the alternator dissociates water into hydrogen and oxygen gas, which escapes through openings in the top of the battery. (Tr. 110–11).

Typically, an automotive battery has a plastic container with a plastic cover which

---

**2.** Hereinafter the PreTrial Order will be cited as "PTO." The trial transcript will be cited as "Tr." Plaintiff's exhibits will be cited as "PX"; defendant's exhibits as "DX."

**3.** The full reaction may be presented in chemical form as follows:

$$PbO_2 + Pb + 2H_2SO_4 \rightleftharpoons 2PbSO_4 + 2H_2O$$
(lead dioxide) (spongy lead) (sulfuric acid) (lead sulfate) (water)

At the positive plate, the reaction is:

$$PbO_2 + 4H{+}SO4 \rightleftharpoons 2H_2O + PbSO_4 {+}{-}2e$$
(lead dioxide) (hydrogen) (sulfate) (water) (lead sulfate) (electrons)

At the negative plate, the reaction is:

$$Pb + SO_4 \rightleftharpoons PbSO4 + 2e$$
(spongy lead) (sulfate) (lead sulfate)

(*See generally* Tr. 108–11; PX1c).

**4.** Industrial batteries are usually very large batteries used to provide emergency lighting and

is hermetically sealed. At the top of the battery, protruding from the cover, are the lead terminals or outputs. The cover also contains six openings, arranged in groups of three, which are called vents or fill openings; the bottom portions of the vents as they go through the cover are called vent wells. Partitions or cell walls within the battery separate the interior of the battery into six individual cells. Each cell contains one element, which consists of alternating positive and negative plates kept apart by separators made of non-conductive material, such as wood, rubber, or plastic. Lead straps connect all the positive or all the negative plates in each cell, and inter-cell connections connect one group of plates of one charge to the group of the opposite polarity in the next cell. The plates sit on elevations in the battery floor known as "restups" or "mudrests" rather than directly on the floor of the battery case. The space between the bottom of the plates and the floor is called the "mudwell," an area into which some of the material from the plates may fall during the life of the battery. (*See generally* Tr. 105–07; PX1a; PX1b; PX2.)

Battery acid, known as electrolyte, is used in varying concentrations in the formation and operation of batteries. The concentration of acid to water is measured by determining the solution's specific gravity, defined as the ratio of the density of a substance to the density of water at a given temperature. Water has a specific gravity of 1.0; as sulfuric acid is added, the specific gravity goes up. A so-called "high gravity" acid might be thirty-five percent sulfuric acid; a "low gravity" acid could have as little as five percent acid. Generally the desired specific gravity of electrolyte in a finished battery is approximately 1.265 at 25°C, which would be about thirty-five percent sulfuric acid. (*See* Tr. 250–51; DX34).

In the manufacture of automotive batteries, the process of charging a battery in its initial state is called formation. At formation, the inert material pasted onto the battery plates is converted to the active state by passing a current through the plates. Two methods of manufacture are commonly used in the battery industry—the "one-shot" and "two-shot" methods. In "two-shot" formation, an assembled battery[5] is filled with low gravity acid in the range of 1.050 to 1.060 and charged so that most of the inactive material is converted to active. The acid is then removed or dumped from the container and the container filled with a higher gravity acid. The combination of that acid with the low gravity acid remaining in the plates produces the desired final level of specific gravity of 1.265. After a boost charge is applied to mix the low and high gravity acids, the vents are inserted in the top of the battery and the battery is ready for shipment. (*See* Tr. 246–49; PX53). In contrast, a "one-shot" formation uses a formation acid with a high enough specific gravity so that only one fill is required. (Tr. 249–50). Both processes have been known for years and are considered to have different advantages. (Tr. 251–52).[6]

A problem frequently encountered in batteries, and relevant to this case, is known as "sulfation." Sulfation generally refers to the formation of lead sulfate on the surface and in the pores of the active material of battery plates. As noted earlier, some sulfation occurs as a natural part of discharge, produced by the reaction of sulfuric acid with the plates. This type forms a finely crystalline sulfate which is easily reduced by a charging current. Sulfation also occurs from self-discharge, and depends on the concentration and temperature of the electrolyte as it acts on plate materials. This sulfation can also be easily reduced by charging current, although the crystals are coarser. The most common use of the term

to power industrial trucks or fork lift trucks. (Tr. 103).

5. Formation may also occur outside of the battery case by charging the plates in tanks, called "tank formation." (*See* Tr. 309–10).

6. Testimony at trial indicated that although "one-shot" formation has certain cost advantages, "two-shot" formation does a better job of converting the inactive material. (*See* Tr. 251–52).

"sulfation," and the use relevant to this case, is the formation of large lead sulfate crystals or crust on the plates as a result of neglect, misuse, or nonuse, as, for example, when a battery is charged and stored on a shelf awaiting sale. Such sulfation is more difficult to reduce with charging current and may injure the plates; as the pores of the plates become clogged with sulfate, the active material may be pushed out of the plates and the plates buckled. *See* G. Vinal, *Storage Batteries* 295–97 (2d ed. 1930) (PX137, Tab C).

The automotive battery market today is divided between original equipment manufacturers and the aftermarket. For original equipment manufacturers, perishability of batteries is not a significant factor because of the large quantity of batteries produced and their rapid turnover. Eighty percent of automotive batteries, however, are sold in the aftermarket, where longer shelf life is desirable. Smaller retailers who sell fewer batteries, slower-moving batteries, and seasonal temperature variations which affect shelf life as well as sales all make perishability an important consideration. (Tr. 167–70). A shelf life of six months would be the usual requirement, but for some slow moving batteries a year's shelf life would be required. (*See* Tr. 170, 172–74).

In 1970, two main types of automotive batteries existed—"wet" batteries and "dry" or "bone dry" batteries. (Tr. 113–14). A wet battery is simply a battery which has been stored with all the electrolyte in it. Wet batteries lose about one percent charge per day at normal room temperature, and thus within fifty to sixty days the batteries would reach the unacceptable level of less than fifty percent charged. (Tr. 165–67). Dry batteries are batteries from which all

the electrolyte has been removed and the plates washed and dried, usually in an oven. They are stored without electrolyte in them; the electrolyte is added at sale or shortly before sale. (Tr. 113–14). Although they have an extended shelf life, the batteries also have certain commercial disadvantages—they are expensive to produce, more costly to distribute, and require lengthy servicing before being put into operation.[7] (Tr. 174–76). In addition, if the plates were not virtually dry and were exposed to air, they would oxidize and become inoperable. (Tr. 254).

A third category of batteries is particularly relevant to this case. For years, battery manufacturers have known that it is desirable to ship batteries after having dumped the electrolyte without going through special steps for washing and drying the plates. Not only are such batteries lighter, but they are also easier to ship because acid is not as likely to spill out of the dumped batteries during shipment. These batteries may be termed "charged and dumped" batteries, having been fully charged or formed and then having had the electrolyte removed by dumping. (PTO 3(b)(12)45). As already noted, moist negative plates tend to oxidize if exposed to air. (PTO 3(b)(6)22).

### B. Development of the Drynamic Invention [8]

In mid-1971, an innovation in automotive batteries appeared on the market—the Globe Union Spin Dry Battery.[9] Under the Globe Union process, instead of drying the plates after dumping the electrolyte, the batteries were placed into a centrifuge which would remove additional acid from the plates and separators as well as the battery container by spinning it rather than

---

**7.** The higher cost of these batteries resulted from the extra manufacturing steps required and the necessity of packaging the acid separately. (Tr. 175). The lengthy servicing time involved adding electrolyte, letting it soak for some time to ensure that it penetrated the pores of the plates, and giving the battery a boost charge before installing it in the automobile. (Tr. 176).

**8.** The term "Drynamic invention" as used in this Opinion will refer both to the battery itself and the process used to manufacture the battery as claimed in the patents in suit.

**9.** Globe Union's process is described in the Halsall patent, No. 3,652,341 (PX 10), which is discussed in more detail at p. 746 *infra*.

by hot air drying of the plates. (*See* Tr. 258–64; PX8; PX9; PX10). Although the plates were not completely dry, the Globe Union batteries had good performance characteristics. (Tr. 117).

Gould perceived the Globe Union batteries to be a potential commercial threat. (*See* Tr. 118, 263). Gould had been experimenting with new manufacturing methods to achieve similar results, but had not been successful.[10] (Tr. 114–16). Upon testing Globe Union's batteries, Gould determined that they were successful because they removed substantially more electrolyte than did dumping the batteries. (Tr. 264–65). It began a development project called Drain Dry to manufacture a competitive product. (Tr. 121). Gould's subsequent attempts to accomplish this result by vacuum drying, steam, hot water, and other methods, all proved failures. (Tr. 265–66).

On December 13, 1971, Gould employees involved in the Drain Dry project held a meeting to discuss various ideas to develop a process comparable to that used by Globe Union. Among the thirty-two suggestions offered at the meeting[11] were suggestions by George Mao and Anthony Sabatino that sodium sulfate be added to the batteries. (*See* PX3; Tr. 124, 266–67). At trial, Sabatino testified that some of the data from testing the various experimental batteries indicated growths of lead sulfate, which he thought might be remedied by the addition of sodium sulfate. (Tr. 267). This suggestion proved successful and ultimately resulted in the Drynamic process. (Tr. 268). By 1974, in fact, Gould had completely changed over its operations to the Drynamic process. (*See generally* Tr. 266–73; 275–76; PX16; PX18). Gould believed that the Drynamic process had significant advantages. First, the batteries were less expensive to produce than dry charged batteries.[12] Second, the batteries were more foolproof at the point of sale, in part because they could be tested before shipping. Finally, the process eliminated the environmental problem of acid disposal which accompanied dry charge manufacture. (Tr. 179–82). Gould sought and obtained two patents on its invention, which are at issue in this lawsuit.

## C. *The Patents in Suit*

The '680 patent, the product patent, was issued on April 6, 1976. GBC argues that the entire patent is invalid. The claims alleged by Gould to be infringed read as follows:

1. A lead-acid storage battery comprising a container having a plurality of cell compartments and a plurality of battery elements consisting of a plurality of positive and negative charged plates with separators positioned therebetween disposed in the cell compartments, said battery being sealed to at least substantially prevent the ingress of air and said battery elements containing a conditioning amount of a metallic sulfate and residual electrolyte and said battery being otherwise substantially free of electrolyte and being activatable by addition of electrolyte thereto.

2. The lead-acid storage battery of claim 1 wherein said metallic sulfate is sodium sulfate.

12. A lead-acid storage battery comprising a container having a plurality of cell compartments and a plurality of formed battery elements consisting of a plurality of positive and negative charged plates with separators posi-

---

10. Two such projects were described at trial. The WADCAB (Water Activated Dry Charged Automotive Battery) project sought to develop a bone dry battery with a vessel of highly concentrated sulfuric acid stored within the case. Upon adding pure water, the acid would somehow be released and become the electrolyte for a normal wet battery. (Tr. 114–15). The Volkswagen project concerned shipping batteries to Germany. (Tr. 115–16).

11. The suggestions included rinsing with solvent, steam drying, vacuum drying, simply sealing the vent openings, adding boiling water and steaming, and adding carbon dioxide. (*See* PX3).

12. Gould estimated the savings at 32–33¢ per battery. (PTO 3(a)(3)16).

tioned therebetween disposed in the cell compartments, said battery being sealed to at least substantially prevent the ingress of air and having been drained of electrolyte, said battery elements containing a conditioning amount of metallic sulfate and residual electrolyte and said battery being activatable by addition of electrolyte thereto.

The claims of the '165 method patent, issued October 26, 1976, which are alleged to be infringed, are as follows:

5. A method for making a lead-acid storage battery capable of being stored and thereafter activated by the addition of electrolyte and including a container having a plurality of cell compartments and a plurality of battery elements consisting of positive and negative plates with separators therebetween, the battery elements being electrically connected, which comprises:

a. providing the battery,

b. forming the battery elements by filling the cell compartments with a formation electrolyte and applying current thereto,

c. draining the formation electrolyte from the cell compartments.

d. filling the cell compartments with an aqueous solution,

e. draining the aqueous solution from the cell compartments,

f. adding a treating agent in an amount sufficient to condition the battery elements in at least one of steps (b) and (d), with the proviso that, when the treating agent is added in step (b), steps (d) and (e) may be eliminated, said treatment affording, under the conditions of treating, a soluble metallic sulfate, and

g. sealing the battery to at least substantially prevent the ingress of air.

7. The method of claim 5 wherein said treating solution includes sodium sulfate.

GBC challenges the entire patent as invalid. The process currently used at Gould is a "two-shot" process, and that at GBC is a "one-shot" process. Briefly, Gould's Drynamic process involves first filling the battery with low gravity acid and charging. The acid is then dumped and a higher gravity acid containing sodium sulfate is added. After letting that electrolyte stand in the batteries so that it permeates the plates and separators, Gould uses a device called a "rocker dumper" which rocks and dumps the batteries. After this second dump, special vent seals are used to substantially seal the battery; a small hole in the top of the seals permits any gases which build up within the container to exit. To activate Drynamic batteries, electrolyte is added and conventional seals used to replace the special seals. (*See* Tr. 277–78).

GBC argues that the patents are invalid for a variety of reasons: 1) anticipation under 35 U.S.C. § 101 and § 102, 2) obviousness under 35 U.S.C. § 103, 3) inequitable conduct and fraud on the Patent Office, and 4) failure to disclose the best mode of invention under 35 U.S.C. § 112. GBC further contends that even if the patents are valid, its Redi Dri batteries do not infringe. Gould asserts that its patents are valid and that certain claims are infringed by GBC. Each side seeks attorneys' fees and additional damages by alleging that this is an exceptional case under 35 U.S.C. §§ 284 and 285. The Court will first address validity, and thereafter infringement.

II. *Presumption of Validity*

As the Third Circuit Court of Appeals has noted: "Normally, the starting point in analyzing a challenge to the validity of a patent is the presumption that the patent is valid, with the burden of demonstrating invalidity by clear and convincing proof resting on the party asserting it." *Aluminum Co. of America v. Amerola Products Corp.*, 552 F.2d 1020, 1024 (3d Cir. 1977); *see* 35 U.S.C.A. § 282 (Supp.1981).[13]

13. Section 282 of the Patent Act provides in pertinent part: "A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or mul-

This presumption is weakened, however, when relevant prior art has not been considered by the Patent Examiner. *Id.; see Northern Engineering & Plastics Corp. v. Eddy,* 652 F.2d 333, 337–38 (3d Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1009, 71 L.Ed.2d 299 (1982); *Philips Electronic & Pharmaceutical Industries Corp. v. Thermal & Electronic Industries, Inc.,* 450 F.2d 1164, 1176 (3d Cir. 1971). In such a case, "the degree by which the presumption is weakened depends on a balancing of the pertinence of the newly cited art against the pertinence of the art actually considered by the Patent Office." *Aluminum Co. of America v. Amerola Products Corp.,* 552 F.2d at 1025.

■ In this case, GBC has alleged that Gould's withholding of pertinent prior art from the patent examiner constituted fraud on the patent office. As indicated in the section of this Opinion entitled "Fraud on the Patent Office," pp. 755–758 *infra,* the Court finds that the prior art allegedly withheld from the Patent Office was merely cumulative of that already presented. This art is discussed more fully *supra,* and the Court merely notes here that the failure to cite such art in no way affects the presumption of validity of Gould's two patents.

### III. *Anticipation*

GBC alleges that the Drynamic invention was anticipated by three pieces of prior art. The relevant statutory standard for determining anticipation is set forth in 35 U.S.C. § 102, which provides in pertinent part:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

.  .  .  .  .

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, ... or

.  .  .  .  .

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. . . .

35 U.S.C. §§ 102(a), 102(e), 102(g). As this Court has recently noted, the standard for anticipation is a high one:

To anticipate a patent, '[a] prior art reference must teach the very invention of the patent', ... or disclose 'a device substantially identical to that claimed under the terms of the patent.' Further, 'it must appear that every material element of the claim in question was disclosed by a single prior art reference.'

*Grefco, Inc. v. Kewanee Industries, Inc.,* 499 F.Supp. 844, 850 (D.Del.1980), *aff'd,* 671 F.2d 495 (3d Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981) (citations omitted).

The material elements of the Drynamic batteries claimed in the patents may be described simply as: 1) a charged battery from which the electrolyte has been removed but which retains residual electrolyte, 2) a metallic sulfate in a conditioning amount within the battery, 3) which produces a battery activatable by the addition of electrolyte. GBC argues that three prior art references—Vesta batteries, the 1930 Vinal textbook, and the Jolley patent—contain these material elements and disclose a substantially identical device. The Court will first set forth the elements of the three prior art references urged by GBC, and then apply the appropriate standard to determine whether any of them in fact anticipate the Drynamic invention.

tiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a pat-

ent or any claim thereof shall rest on the party asserting such invalidity."

## A. *Prior Art Alleged to Anticipate*

### 1. Vesta Batteries

GBC contends that batteries manufactured by the Vesta Company in the late 1920's and early 1930's anticipated the Drynamic invention. Charles Herb Allen had worked for Vesta from 1928 to 1930 and testified at trial about the Vesta batteries. According to Allen, the plates of these batteries were formed in weak acid in tanks, the acid was dumped, the plates then placed in a moist condition in the battery container, and the container refilled with higher gravity acid. The batteries would then be sealed and boost charged. Some batteries would be drained and sealed with a vent cap made of rubber with a tiny hole in the top to relieve gas pressure. (Tr. 1000, 1009–10; DX 66, ex 1). Allen further testified that as part of this process, the wooden separators used in these batteries were boiled in a caustic solution or "liquor" containing sodium hydroxide. (Tr. 1005). He stated that when neutralized with sulfuric acid, sodium sulfate ions precipitated out but remained in solution. (Tr. 1006). This "liquor" was used as a negative plate "expander," which is a substance put in the paste to keep the negative plate in a satisfactory condition and improve the battery's electrical performance. (Tr. 1007; *see* Tr. 1028).[14] At a later point, the precipitate itself, called "coffee," was used in the negative plates. (Tr. 1020–21).

According to Allen, the Vesta batteries were activatable by the addition of electrolyte, and they had improved, although not indefinite, shelf life. (*See* Tr. 1014; DX66, ex 4; DX66, ex 7). A report which he prepared when Vesta was taken over by National Battery[15] indicated that "vacuum sealing [the Vesta process] does, to a certain extent, prevent batteries from becoming discharged without acid in them and while they are standing idle." (*See* Tr. 1022, 1030; DX66 ex 2).

Allen also testified regarding batteries manufactured by Vitalic.[16] He had been confronted by a problem with "treeing" during formation of batteries; lead precipitating out in the weak forming acid would penetrate the separators and cause a short circuit. He testified that he had cured this dendritic growth by treating the wood separators with magnesium or sodium sulfate. (Tr. 1026–27). Allen further said that Vitalic had manufactured charged and dumped batteries, sealed with tape over the vents. (Tr. 1025).

### 2. *Vinal Textbook*

GBC contends that the second edition of Dr. George Wood Vinal's textbook entitled *Storage Batteries*, published in 1930, sets forth all the elements of the Drynamic invention. First, the work contains a reference to "batteries in the moist condition" at page 35:

> Batteries in the moist condition, to which electrolyte must be added when they are made ready for service, can be stored in a partially charged condition for six months or more. The freshly formed elements for such batteries are drained to remove excess acid before being placed in the jars. The batteries are then sealed to exclude the air, but at the same time provision must be made for the escape of any gas which may be formed within the cells.

(PX137, Tab C, at 35). Second, Vinal discusses four different conditions for shipping starting and lighting batteries. One condition is called "Charged Unfilled," and Vinal notes: "Batteries in the charged unfilled condition shall have cell vents sealed in an approved manner at a time when the plates are fully charged. The cells shall contain no electrolyte other than that which may drain from the plates and separators." (PX137, Tab C, at 347). GBC's technical

---

14. Testimony at trial indicates that a patent, the Giard patent, No. 1,940,714, was ultimately obtained on this process, although the record is not entirely clear on this question. *See* Tr. 1074; DX17.

15. National Battery later became part of Gould. (Tr. 1021).

16. Vitalic was later bought out by GBC. (Tr. 1027).

expert, Rine Kruger, testified that these references taught a charged, dumped, and substantially sealed battery with residual electrolyte. (*See* Tr. 1092–95).

Vinal's work also contains a section entitled "Patent Electrolytes," which discusses the use of battery additives as follows:

Within the past few years, a considerable number of special electrolytes for use in storage cells, particularly of the starting and lighting type, have appeared. For lack of a better designation for these electrolytes, they have been commonly referred to as patent electrolytes. Very few of them, however, are patented, and for the most part their composition is not revealed by the manufacturers. From the tests and experiments which have been made on this class of substances it may be stated that few, if any, of them have any real merit. They fall naturally into three classes, the first of which includes those consisting merely of ordinary sulphuric-acid solution, of approximately customary densities, sold under trade names at fancy prices and with extravagant claims. The second class of these electrolytes contains substances, such as sodium sulphate, which are supposed to decrease the sulphation of the plates within the battery. The third class is that containing various corrosive agents such as bichromates, nitrates, and similar substances.

(PX137, Tab C, at 130–31). Vinal continues by criticizing claims that such additives rapidly charge batteries or that they achieve additional capacity. (*Id.* at 131).

Vinal's textbook also specifically discusses the use of sodium sulphate to reduce sulphation. He notes:

Frequent attempts have been made to reduce the sulphating action of sulphuric acid on the plates of storage batteries by the addition of various substances. Chief among these has been sodium sulphate, which is frequently sold under the name of Glauber salts. Schoop, as far back as 1895, expressed the opinion that the use of sodium sulphate was not beneficial. Its use appears to have originated with

some experiments made in England by Preece. Neither is sodium sulphate a satisfactory substance for the removal of the sulphation from the plates.

(PX137, Tab C, at 126). Vinal recommends a simple water treatment to remove sulfation, "particularly in the case of batteries of the starting and lighting type." (*Id.* at 126–27).

GBC's technical expert Kruger testified that by combining the various references in Vinal, "I am taught how to complete a charged, dumped, treated with sodium sulfate battery, sealed, within the various references. I had to go from one page to another and pick that up." (Tr. 1207–08). In regard to Vinal's criticism of patent electrolytes, Kruger testified: "Well, a person skilled in the art reads all material and gets from it suggestions to combine things in various ways to achieve the desired results, and he doesn't take verbatim all the teachings of any one text, I don't believe." (Tr. 1211). He further stated that the language in Vinal was "not a glowing endorsement" of the additive. (Tr. 1212).

### 3. *The Jolley Patent*

The third prior art reference alleged by GBC to anticipate the Drynamic invention is the Jolley patent, No. 2,650,257, issued August 25, 1953. (DX259). The patent claimed a charged and dumped battery which used a special electrolyte to enable storage for prolonged periods of time. The electrolyte was obtained by "leaching a particular type of impregnated shale rock occurring naturally in a certain geologic formation located in Emery County in the State of Utah, and, further, the conditioning of the plates of the battery while such plates are immersed in this special electrolyte." (DX259, col. 1, lines 30–37).

According to the patent, at formation the special electrolyte would be introduced into the battery, the battery charged, and then discharged to "substantially the 'dead' condition." (*Id.* at col. 3, lines 1–2). Ordinarily the battery would then be recharged for use. At other times, however, the battery would not be recharged:

... though occasionally special considerations, such as the necessity of long-distance transportation to the point of sale or use, will make it desirable to dump the "forming" electrolyte and replace it with fresh electrolyte later at the new location. In such instances, it is desirable that the battery be refilled with a similar low gravity electrolyte.

(*Id.* at col. 3, lines 5–12). The patent further identified twenty-one "radicles" or chemicals found in the leach solution, including sodium and sulfate. Kruger testified that when shipped, these batteries were charged, dumped, substantially sealed, and contained sodium sulfate. (*See* Tr. 1105, 1120).

### B. *Discussion*

The Court must determine whether any of the three references set forth above discloses a device substantially identical to that claimed by the patents in suit. After carefully analyzing the three references discussed above, the Court holds that there is no anticipation of the Drynamic invention.

First, the information presented at trial about the Vesta and Vitalic batteries is simply too sketchy for the Court to rule that they anticipated Gould's invention. Even if one accepts Allen's testimony that the Vesta batteries were charged, dumped, and substantially sealed, Allen did not testify that he knew how much, if any, sodium sulfate was present in the "liquor" or "coffee" that was used in the batteries. The Court cannot simply assume that some chemical reaction occurred between sodium hydroxide and sulfuric acid which produced sodium sulfate. There is no evidence to indicate what amount of sodium sulfate, if any, precipitated into solution, nor whether any actually was present in the finished product. In fact, Allen stated that the separators were washed several times after being boiled in solution to remove as much foreign material as possible. (Tr. 1028). The evidence regarding Vitalic batteries is even less conclusive. The fact that the wood separators were treated in some way with magnesium or sodium sulfate does not necessarily mean that the magnesium or sodium sulfate was present in the finished battery. In addition, although Allen testified that so-called "moist" batteries were manufactured at the Vitalic plant, he did not testify whether the batteries he treated with metallic sulfate were these moist batteries or conventional wet batteries. (*See* Tr. 1025–27).

■ Further, the only evidence that the Vesta and Vitalic batteries contained all the elements of the Drynamic invention was the testimony of GBC's witness Allen. Although contemporary advertisements making various claims for the Vesta batteries were introduced, they did not mention the use of sodium sulfate in the batteries. (*See* DX66, Ex. 4–7). Thus the Court must rely on the uncorroborated testimony of a witness based on his recollection of events which occurred over fifty years ago. The often-cited words of the Supreme Court are particularly relevant here:

> We now have to deal with certain unpatented devices, claimed to be complete anticipations of this patent, the existence and use of which are proven only by oral testimony. In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory, and beyond a reasonable doubt.

*Washburn & Moen Manufacturing Co. v. The Beat 'em all Barbed Wire Co.*, 143 U.S. 275, 284, 12 S.Ct. 443, 447, 36 L.Ed. 154 (1892). Such oral testimony must "be subjected to the closest scrutiny." *Id.* at 285, 12 S.Ct. at 447. The Third Circuit Court of Appeals has noted three factors which may be used in determining whether oral testimony meets this stringent test: 1) the length of time that had elapsed between the event and the date of trial, 2) the lack of corroborating evidence, and 3) the degree to which it was clear that the witness was

testifying from actual recollection rather than a reasoned belief. *See Jones Knitting Corp. v. Morgan,* 361 F.2d 451, 456 (3d Cir. 1966).

■ In this case, Allen testified about manufacturing processes at Vesta which occurred over fifty years before trial.[17] In addition, as already noted, no other corroborating evidence was introduced to bolster Allen's testimony that Vesta and Vitalic batteries contained sodium sulfate. Finally, although Allen may well believe that sodium sulfate was present in the batteries, he did not testify that he had ever known this to be a fact. The Court therefore concludes that GBC has not sustained its heavy burden of proving by clear and convincing evidence that either the Vesta or the Vitalic batteries anticipated the Drynamic invention.

■ The Vinal textbook also suffers from defects which preclude it from being an anticipation of Gould's process. The appellate court has established a standard for determining whether a prior publication constitutes an anticipation:

> "For a prior publication to be sufficient to defeat a patent it must exhibit a substantial representation of the invention in such full, clear, and exact terms that one skilled in the art may make, construct and practice the invention without having to depend on either the patent or on his own inventive skills."

*Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp.,* 546 F.2d 530, 544 (3d Cir. 1976) (quoting *Philips Electronic & Pharmaceutical Industries Corp. v. Thermal & Electronics Industries, Inc.,* 450 F.2d 1164, 1169 (3d Cir. 1971)), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977). The reference must contain "within its four corners, adequate directions for the practice of the patent claim sought to be invalidated." *Congoleum Industries, Inc. v. Armstrong Cork Co.,* 339 F.Supp. 1036, 1052 (E.D.Pa.1972),

*aff'd,* 510 F.2d 334 (3d Cir.), *cert. denied,* 421 U.S. 988, 95 S.Ct. 1991, 44 L.Ed.2d 478 (1975). As this Court has previously noted: " 'Unless all of the same elements are found in exactly the same situation and united in the same way to perform the identical function' in a single prior art reference, 'there is no anticipation.' " *Johnson & Johnson v. W. L. Gore & Associates, Inc.,* 436 F.Supp. 704, 726 (D.Del.1977) (quoting *Walker v. General Motors Corp.,* 362 F.2d 56, 58 (9th Cir. 1966).

In the Vinal textbook, the references which in combination allegedly anticipate the Drynamic device are scattered throughout the work. One would have to pick and choose among various pages in Vinal to piece together a battery such as that claimed in the patents in suit. This process of selection would require some inventive skills to determine by simply reading Vinal's book that adding sodium sulfate in a conditioning amount to a moist battery would enhance the shelf life of that battery. The elements of the invention are not in the same location nor are adequate directions provided to manufacture the invention. *See Application of Arkley,* 455 F.2d 586, 587 (Cust. & Pat.App.1972) (anticipation must clearly and unequivocally disclose claimed matter without any need for picking, choosing, and combining disclosures not directly related to each other).

Even more damaging to the use of Vinal as an anticipation is the fact that Vinal clearly teaches away from the use of sodium sulfate as an additive. One reading Vinal's section entitled "Patent Electrolytes" would reasonably conclude that such substances had little, if any, value in enhancing the operation of a battery; the text explicitly states that "few, if any of these, have any real merit." (PX137, Tab C, at 130–31). Furthermore, Vinal's discussion of sulfation expressly notes that sodium sulfate is "not beneficial." *Id.* at 126. Thus, one of the essential elements of the

---

**17.** In *Jones Knitting,* the witness testified to a recollection approximately twenty-five years old on a matter which was not directly related to his particular line of work. 361 F.2d at 456.

Here, although battery manufacture was Allen's principal line of business, the time period elapsed was twice as long as that in *Jones Knitting.*

invention—the metallic sulfate additive—is missing from the Vinal reference. The Court holds that the 1930 Vinal textbook did not anticipate the Drynamic process.

The Jolley patent also fails the test of anticipation. As one court has noted, "The specifications of the cited prior reference must disclose, in substance, the same knowledge and the same directions as the specifications of the patent in suit." *Congoleum Industries, Inc. v. Armstrong Cork Co.*, 339 F.Supp. at 1052. That court further stated:

> Furthermore, it is not sufficient to constitute an anticipation that the reference relied upon discloses a process which might, by slight modification, be made to perform the function of the patented process.... Simply because all the ingredients were present does not mean that they would have been used in the proper proportions nor heated to the proper temperature for the proper length of time.

*Id.* GBC has failed to meet its heavy burden of showing that the Jolley patent anticipated the Drynamic batteries. First, the additive recommended by the patent is a leach solution derived from processing a particular variety of shale indigenous to Emery County, Utah. (DX259, col. 3, lines 17–25). The solution so derived contained a high sulfate radical content of approximately 18 grams per liter, as well as a variety of other elements and compounds, including sodium. (*See id.* col. 3, lines 50–76). Even assuming that sodium sulfate was present in the electrolyte,[18] it is also admitted that the electrolyte contained several elements known to be harmful to batteries, such as iron, manganese, and nickel. (Tr. 1215–16). One looking to the Jolley patent to solve the problem of successfully manufacturing a charged and dumped battery would have to ignore the other nineteen substances present in the leach solution to simply choose to add sodium sulfate. The more logical approach for one studying the Jolley reference would be to use an electrolyte whose chemical composition approximated that of this special leach solution. The patent therefore fails to teach one essential element of the patents in suit—the additive.

Two other points further weaken the Jolley reference. First, substantially sealing the battery is not mentioned in the patent. Substantially sealing the battery is an element of the Drynamic invention, and the Court will not simply assume that the Jolley batteries were substantially sealed as opposed to hermetically sealed or unsealed.[19] In addition, there is some uncertainty in the patent as to whether the Jolley patent envisioned shipping batteries in a charged or discharged condition. GBC's own technical expert testified that he could not be sure of what the patent meant by "discharging the battery to substantially the 'dead' condition." (*See* Tr. 1113–14; DX259, col. 3, lines 1–2). In light of the uncertainty surrounding the Jolley reference, the Court must conclude that GBC has not by clear and convincing evidence demonstrated that it anticipated the patents in suit.

---

**18.** Although Kruger testified that his reading of the patent indicates the presence of sodium sulfate in the leach solution (Tr. 1104), sodium sulfate as a compound appears nowhere in the patent. In the absence of expert testimony that the sodium and the sulfate in the solution somehow combine when mixed with sulfuric acid to form sodium sulfate to the exclusion of other chemical reactions caused by other compounds and elements of the leach solution, the Court cannot find that GBC has proven the existence of sodium sulfate in the battery by clear and convincing proof.

**19.** GBC argues that substantially sealing a battery was obvious to those skilled in the art, and that therefore the known element may be considered in conjunction with the elements present in the patent when determining anticipation. *See In re Donohue*, 632 F.2d 123, 125 (Cust. & Pat.App.1980); *Application of Samour*, 571 F.2d 559, 562–63 (Cust. & Pat.App. 1978). Nevertheless, the Court is of the opinion that a reference alleged to anticipate must contain all the elements of the invention. Although the Patent Examiner stated during the prosecution of the Gould patents that sealing a battery to prevent oxidation was obvious (*see* DX53, paper 2), one might reasonably read the Jolley patent to indicate that use of the special electrolyte might not necessitate substantial sealing. There is no indication whether conventional vent caps or vent caps with small holes in them would be necessary for the Jolley batteries.

The court therefore rejects GBC's contention that Gould's patents are invalid on the grounds of anticipation.

IV. *Obviousness*

■ GBC argues that the Drynamic invention is obvious and therefore the patents are invalid under 35 U.S.C. § 103. That section provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103. The Supreme Court set forth the standards for evaluating a § 103 claim in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), as follows:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent are resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

383 U.S. at 17–18, 86 S.Ct. at 693–94. The Third Circuit has recently stated its position that the *Graham* test applies to combination patents as well as other patents. *See Rengo Co. v. Molins Machine Co.*, 657 F.2d 535, 546 (3d Cir.), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 600, 70 L.Ed.2d 590 (1981). The Court will therefore first set forth the prior art, then present the differences between Drynamic and the prior art, and finally determine the level of ordinary skill of a hypothetical artisan in the art. The Court will then decide whether the prior art renders the invention obvious.

A. *Scope and Content of the Prior Art*

The parties agree that in general terms the relevant art is that of manufacturing lead-acid storage batteries. The prior art presented at trial falls into two categories—prior art concerning "charged and dumped" batteries, and that concerning the use of additives in batteries generally. Each will be addressed separately.

1. *Charged and Dumped Batteries*

Several patents concerning batteries of the "charged and dumped" type were placed before the Patent Examiner during prosecution of the Gould patents. Four such patents were stressed at trial—the Halsall, Carson, Benner, and Amlie patents. The Halsall patent, No. 3,652,341 (PX10), claimed the Globe Union Spin Dry process discussed at pages 737–738 *supra*. After formation, the battery preferably was inverted and drained. (PX10, col. 4, lines 23–25). The battery would then be subjected to a centrifugal force to remove from seventy to ninety-seven percent of the forming acid. (*Id.*, col. 4, lines 36–44; col. 8, lines 52–56). The battery was then sealed to prevent the ingress of air, and would be activated simply by adding electrolyte. (*See id.*, col. 8, lines 40–60). GBC's expert Kruger testified that the Halsall patent clearly taught charging, dumping, and spinning the battery to get more electrolyte out of the plates. (*See* Tr. 1286–87).

The Carson patent, No. 3,314,158 (PX59), claimed batteries that were charged and dumped. The plates were then washed and dried while in the case by hot gases in a drying oven and were hermetically sealed. (PX59, col. 1, lines 46–55). The Benner patent, No. 1,737,039 (PX50), claimed a method for storing a battery containing wet plates by "covering the plates with protective, non-reactive material, preferably an

aqueous liquid, such as water or dilute sulfuric acid, substantially saturated with lead sulfate." (PX50, col. 1, lines 39–45). The solution was added after the batteries were charged, dumped, and washed. (*Id.*, col. 2, lines 64–72; Tr. 1289–90). Finally, the Amlie patent No. 3,834,946 (in DX54) claimed a battery that was charged, dumped, and then filled with water. The water could then be dumped, air introduced into the battery to passivate the negative plates, and the battery sealed. (DX54; No. 3,834,946, col. 2, lines 9–23; *see* Tr. 1292–94).

In addition, GBC contends that the Vesta, Vinal, and Jolley references discussed *supra* constitute prior art. Four additional patents have been urged by GBC to be pertinent prior art. These four patents all claim vent seals designed for use in charged and dumped batteries. The 1931 Woodbridge patent, No. 1,816,035 (DX2), noted that: "It is often found convenient to ship and store batteries in a fully charged condition but with the electrolyte removed from the cells. This is commonly known as a charged and dumped condition." (DX2, col. 1, lines 1–5). The patent further explained that "[e]ven when the electrolyte is removed from the cell, there is a residue retained in the pores of the plates and wood separators...." (*Id.*, col. 1, lines 12–14). This residual electrolyte frequently caused a chemical reaction which resulted in excessive gas pressure within the battery. The object of the Woodbridge invention was to remedy the problem of sealing the batteries—"to provide a method and means by which storage battery cells in fully charged condition may be stored after the removal of the electrolyte for many months without material loss of capacity and without developing excess pressure." (*Id.*, col. 1, lines 37–42). The patent claimed a vent seal with a small hole in the top to let out the excess gas accumulation without permitting air to enter and oxidize the plates. (*See generally* Tr. 1126–30). The other three patents—Petrosky, No. 1,786,961 (DX18), Wallace, No. 1,753,545 (DX19), and Wallace and Petrosky, No. 1,907,911 (DX20)—claimed similar vent seal devices.

GBC has also urged as prior art the so-called "Russian reference," a Russian patent entitled "Method of Protecting Lead-Acid Storage Batteries With Absorbed Electrolyte from the Effect of Deep Discharge." (*See* DX6; DX7). An absorbed electrolyte battery is one where most of the electrolyte is stored in some media between the plates, such as in a glass plate or other absorbent material. (Tr. 112–13; 283). Such a battery differs from a starting, lighting, and ignition battery in that internal resistance is not as critical; in an SLI battery, manufacturers strive for the lowest internal resistance by having very thin plates and very thin separators to achieve the most power. (*See* Tr. 111–13). The Russian reference recommended using sodium sulfate in absorbed electrolyte batteries operating without free electrolyte when they had gone into deep discharge—i.e., the specific gravity of the electrolyte was approaching water—and sulfation had occurred. After using sodium sulfate to revive the batteries, the reference recommended pouring out the liquid in the batteries for transportation. (*See* DX7). This reference was not placed before the Patent Examiner.

The question before the Court is which of these references may be considered to be relevant prior art. This Court has previously noted that "[t]he relevant prior art is that which one skilled in the art would reasonably be expected to look to in order to solve a problem in the art." *Johnson & Johnson v. W. L. Gore & Associates*, 436 F.Supp. at 718. The problem to be solved here was how to manufacture a charged and dumped lead-acid battery with extended shelf life. One skilled in the art would reasonably be expected to look to prior art concerning wet, charged and dumped, and dry charged batteries to solve the problem. In addition, it would be reasonable for such a person to look to the related art of vent seals for these batteries as one tool for solving the problem. The four patents urged by Gould—Halsall, Carson, Benner, and Amlie—and the four patents urged by GBC—Woodbridge, Petrosky, Wallace, and Wallace and Petrosky—constitute such pri-

or art.[20] In addition, the Vesta, Vinal and Jolley references teach charging and dumping. The Russian reference, however, addresses an entirely different kind of battery, one which has different characteristics from those of an automotive battery, and is not prior art.

To briefly summarize the prior art on charged and dumped batteries, batteries from which the electrolyte had been removed after charging were known in the prior art. A number of additional elements such as drying, water dumping, and spinning were also taught to prolong shelf life of such batteries. In addition, substantially sealing these batteries to permit gases to exit without allowing air to enter was known in the prior art.

### 2. Additives

The parties introduced a large number of references regarding the use of battery additives. They can be grouped into two categories—those teaching the use of sodium sulfate and those teaching against it. The earliest reference to sodium sulfate in batteries appears in an 1890 article by Gladstone and Hibbert in the *London, Edinburgh, and Dublin Philosophical Magazine and Journal of Science* (DX1). The article describes a lecture by a Mr. Preece on secondary batteries, noting: "Among the topics treated was the influence of the composition of the electrolyte on the working of the cell, and it was stated that the addition of sodium sulphate to the acid solution was of very considerable advantage." (DX1 at 162). The article further explained that "the chief benefit, however, is stated to be that the sodium salt diminishes the chance of objectionable sulphating in the cell, and where such sulphating occurs, enables it to be removed by a charging current much more readily than when sulfuric acid alone is employed." [DX1 at 162–63].

GBC also introduced a 1912 article by Bennett and Cole published in *Transactions of the American Electrochemical Society*

entitled "The Regeneration of Sulphated Storage Cells." (DX3). In that article, the authors noted the problems which had arisen with sulfated grids and set forth their solution: "In order, therefore, to obtain a sodium hydroxide solution in the pores of the lead plate, where the largest tendency to sulphate is found, electrolytes with sodium sulphate as electrolyte suggested itself at once." (DX3 at 304). The article includes the apparent transcript of a discussion of the paper. In this discussion, Dr. Bancroft noted that this treatment could not improve automobile batteries, although Mr. Knight stated that he had used sodium sulfate in ignition batteries with excellent results for six months. (*Id.* at 308–09). Dr. Bancroft further noted that "[t]here are plenty of references in the scientific literature from which you can make your choice as to whether it is a good thing or not." (*Id.* at 309). Bennett indicated that the sodium sulfate concentration was from 1.5 to 2 percent. He further stated that "there is nothing novel about this use of dilute sodium sulphate in the storage battery. This has been known for years, and, in fact, has been practiced with experimental cells in the laboratory at Cornell," noting and citing the Gladstone and Hibbert article. *Id.* at 310.

A third article advocating the use of sodium sulfate is "The Effect of Certain Impurities in the Forming Acid on Plate Forming Time," written by Hatfield and Harner and published in the 1936 *Transactions of the Electrochemical Society*. (DX14). No witness testified regarding this article. The article addressed using sodium sulphate in amounts of 1, 3, 5, 7, and 9 percent by weight in 1.125/1.250 forming acid, and reported "phenomenal" results, stating: "Some of the findings seemed so phenomenal in that additions of sodium could cause a positive plate to clear of sulfate much more rapidly that a complete recheck of the results was made, only to find the check results nearly identical with the first."

---

20. Although the Court holds that the vent seal patents are prior art, it does not hold that the failure to present them to the Patent Examiner weakens in any way the presumption of validity nor does it constitute fraud on the Patent Office. *See* pp. 755–758 *infra*.

(*See* DX14 at 248–50). GBC also urged the Vesta, Vinal, and Jolley references as prior art regarding battery additives.

Gould, on the other hand, cited a variety of references to show that although sodium sulfate was a known additive, the prior art taught against its use in batteries. The 1951 National Bureau of Standards pamphlet entitled *Battery Additives* (PX44), by P. L. Howard and Geo. W. Vinal, described the results of tests on batteries using additives and concluded: "It appears ... that both sodium and magnesium sulfates are ineffective in improving the condition of the batteries or in prolonging their life." (PX44 at 29). The 1956 article entitled "Batteries" appearing in *Encyclopedia Britannica* criticized battery additives or "dopes" in this way:

> The battery additives most frequently sold consist of a mixture of magnesium sulfate and sodium sulphate. Demonstrations by a salesman are frequently impressive to the uninitiated but practically never is such a test made by comparing identical batteries with and without the addition agent. When tests are made in this fashion, it is usually concluded that the materials are either harmful or useless. The tremendous profits make this traffic difficult to discourage, although better business bureaus, government laboratories, large battery users and battery manufacturers are practically unanimous in disapproving the use of these 'dopes.'

[PX45 at 2170]. Arendt's 1928 textbook also indicated doubt about special electrolytes, noting: "The best that can be said of these is that *some are harmless* to the lead cell; this group comprises those which add sodium or magnesium sulphate to the normal electrolyte; this, however, accomplishes no useful result." (PX137, Tab B, at 66–67 (emphasis in original)). Arendt's text further notes regarding sulfation that "the introduction of small amounts (1 to 2 percent by weight) of sodium sulphate or carbonate into the electrolyte has been suggested frequently as a means for correcting unhealthy sulfation. [citing the Gladstone and Hibbert article (DX1)]. However, in general, this treatment has not been found consistently effective." (*Id.* at 167).

The first edition of Vinal's textbook, published in 1924, contained the same discussion of additives as that presented in the second edition, discussed at pages 741–742 *supra*. (*See* PX137, Tab A, at 120, 124–25). Vinal's fourth edition, published in 1955, continues the criticism of the use of sodium sulfate to remove sulfation from the plates. (*See* PX137, Tab E, at 155). His discussion of battery additives, however, is significantly expanded. He states:

> Since 1915 several hundred of these preparations have appeared with claims, more or less typical, that they extend shelf life, reduce effects of sulfation, reduce operating temperatures, and some even claim to charge the batteries.... Abundant test data are available to show that the performance of batteries treated with such materials [sodium or magnesium sulfate] is not significantly different from that of control batteries subjected to the same tests.

(PX137 Tab E at 157–58). He continues by noting that "[t]he ineffectiveness of small quantities of sodium hydrate, carbonate, or sulfate added to the usual sulfuric acid electrolyte was known to authorities more than fifty years ago," citing a 1902 textbook as authority. *Id.* at 158. Vinal further cites the National Bureau of Standards study (PX44) to show that the ineffectiveness of additives had been confirmed by an extended investigation. *Id.*

To briefly summarize this prior art, the use of sodium sulfate as an additive in a battery has been known since 1889. Nevertheless, the most recent reference to teach the use of sodium sulfate is the Hatfield and Harner article of 1936.[21] In addition, texts appearing as early as 1928 criticized the use of these additives, and the references of the thirty-five years preceding the Drynamic invention uniformly teach against their use, including a government-

---

21. As already discussed, the Court does not consider the Jolley reference to be teaching the use of a sodium sulfate additive. *See* p. 745 *supra*.

sponsored study in 1955 and a leading text-book in the field.

### B. *Differences Between the Prior Art and the Claims At Issue*

■■■■■ The principal difference between the prior art and the Gould patents is that no charged and dumped battery in the prior art used a sodium sulfate additive to prolong shelf life. The Drynamic process uses sodium sulfate as a principal element of the invention. It was conceded at trial that it was not known how sodium sulfate works—Gould asserts that it increases shelf life, and GBC argues that, if the additive works at all, it has some marginal effect on charge acceptance as the electrolyte approaches water.[22] (*See* Tr. 797; 800–01). Gould theorizes in its patent that sodium sulfate decreases the solubility of lead compounds, keeping them in solution and thus preventing them from crystallizing to form harmful sulfation. Earlier theories on sodium sulfate indicated that it increased the solubility of lead and dissolved sulfation.[23]

### C. *Level of Ordinary Skill in the Art*

■■■■■ In determining the level of ordinary skill in the art, the Court must look to the hypothetical "worker in the industry who is attempting to solve the problems the inventor addressed by means of the patented device." *Stanley Works v. McKinney Mfg. Co.*, 520 F.Supp. 1101, 1109 (D.Del. 1981), aff'd, 681 F.2d 809 (3d Cir. 1982). The parties have agreed that a person of ordinary skill in the art would have two to five years of practical experience with lead-acid batteries or a technical degree and two years experience. (*See* Tr. 1241–46).[24] Such a person would be charged with knowledge of all the prior art irrespective of whether persons of ordinary skill in the field, or he himself, or anyone else, actually possessed such all-encompassing familiarity with the prior art. *See Tokyo Shibaura Electric Co. v. Zenith Radio Corp.*, 548 F.2d 88, 94 n.18 (3d Cir. 1977).

### D. *Determination of Obviousness*

As outlined above, charged, dumped, and substantially sealed batteries containing residual electrolyte were known in the prior art. In addition, sodium sulfate as an additive in batteries was known in the prior art, although not taught for thirty-five years. The question before the Court is simply whether it would have been obvious to a hypothetical worker of ordinary skill in the art to add sodium sulfate to a charged and dumped battery to improve its shelf life.

■■■■■ It should be noted at the outset that the mere fact that the various elements which make up the Drynamic invention existed in the art does not render Gould's process obvious. As the Third Circuit appellate court has noted: "A new use for an old process or product is patentable if the new use or application is itself not 'obvious' to one skilled in the art." *Allegheny Drop Forge Co. v. Portec Inc.*, 541 F.2d 383, 386 (3d Cir. 1976). A combination

---

**22.** At some points in trial, GBC contended quite vigorously that the sodium sulfate additive is ineffective in improving shelf life. (Tr. 31–39, 99–100, 1233). Sufficient evidence was produced at trial to persuade the Court that sodium sulfate does have some utility in a charged and dumped battery. The Court further notes that it cannot understand why GBC would engage in nearly six years of litigation and spend money on its own sodium sulfate additive if in fact sodium sulfate is useless. The Court does not accept GBC's proffered reason that the purchasers somehow demand such an additive so that it must be added even though it is entirely worthless. (*See* Tr. 85–87).

**23.** The theory of why an invention works does not determine the validity of a patent. One may not patent something already known in the art by devising a novel theory for its known properties.

**24.** In this case, Thomas Asta, Anthony Sabatino, Rine Kruger, Charles Herb Allen, and John Nees were qualified to testify regarding what one skilled in the art of lead-acid storage batteries would have known. Gould's patent law expert Martin Adelman, on the other hand, was not a person skilled in the art, but a patent lawyer, with no experience in battery manufacture. The Court disregards his testimony insofar as it purported to offer any expertise in regard to battery manufacturing. *See Universal Athletic Sales Co. v. American Gym Recreational & Athletic Equipment Corp.*, 546 F.2d at 537–38.

of old elements is not necessarily invalid; indeed, as the Third Circuit has recently pointed out, "every invention is a combination of old elements." *Rengo Co. Ltd. v. Molins Machine Co.*, 657 F.2d at 545. Judge Learned Hand stated the same proposition over forty-five years ago:

> [T]he defendant argues that the supposed invention is no more than a substitution of materials familiar to the art in the same uses; an aggregation of which each part performs what it did before. We may concede as much arguendo, for the same may be said of every invention. All machines are made up of the same elements; rods, pawls, pitmans, journals, toggles, gears, cams, and the like, all acting their parts as they always do and always must. All compositions are made of the same substances, retaining their fixed chemical properties. But the elements are capable of an infinity of permutations, and the selection of that group which proves serviceable to a given need may require a high degree of originality. It is that art of selection which is the "invention" and it must be beyond the capacity of commonplace imagination.

*B. G. Corp. v. Walter Kidde & Co.*, 79 F.2d 20, 21–22 (2d Cir. 1935), *quoted in Rengo Co. Ltd. v. Molins Machine Co.*, 657 F.2d at 545. The Court must determine whether the invention was obvious in light of the prior art. Here, the fact that the prior art taught against using sodium sulfate as an additive compels the Court to the conclusion that the Drynamic invention would not have been obvious.

In some ways, the facts of this case are analogous to those addressed by the Supreme Court in *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). In *Adams*, a companion case to *Graham v. John Deere Co.*, the Court upheld a patent claiming a nonrechargeable battery, which was "the first practical, water-activated, constant potential battery which could be fabricated and stored indefinitely without any fluid in its cells." 383 U.S. at 43, 86 S.Ct. at 710. Adams had used cuprous chloride and magnesium as electrodes in an electrolyte of either plain water or salt water and found that because the chemical reactions within the battery liberated large quantities of heat during operation, the battery was operable in temperatures ranging from –65° F to 200° F. *Id.* The Government, which had begun using Adams' device during World War II, claimed that the battery was obvious in light of the prior art.

The Court noted that the mere fact that various elements of the battery were known did not render the device unpatentable:

> It begs the question ... to state merely that magnesium and cuprous chloride were individually known battery components. If such a combination is novel, the issue is whether bringing them together as taught by Adams was obvious in the light of the prior art.

*Id.* at 50, 86 S.Ct. at 713. The Court then concluded that the Adams device was nonobvious:

> Despite the fact that each of the elements of the Adams battery was well known in the prior art, to combine them as did Adams required that a person reasonably skilled in the prior art must ignore that (1) batteries which continued to operate on an open circuit and which heated in normal use were not practical; and (2) water-activated batteries were successful only when combined with electrolytes detrimental to the use of magnesium. These long-accepted factors, when taken together, would, we believe, deter any investigation into such a combination as is used by Adams.

*Id.* at 51–52, 86 S.Ct. at 714; *see Trio Process Corp. v. L. Goldstein & Sons*, 461 F.2d 66, 71 (3d Cir.) (when prior art indicates that patented procedure will be unproductive, combination of old elements to produce unexpected results may be patentable), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). Similarly, one of ordinary skill in the art would have had to ignore the "long-accepted factors" that (1) charged and dumped batteries required some additional factor such as drying, spinning, or a special seal to prolong shelf life; and (2) battery additives had been demon-

strated to have little, if any, value in enhancing battery operation.

■ Even more persuasive is the fact that even though sodium sulfate was known in the art, the prior art clearly taught against its use. The Court must look to the state of the prior art at the time of the invention. *See Funnelcap, Inc. v. Orion Industries, Inc.*, 421 F.Supp. 700, 707 (D.Del. 1976). The hypothetical inventor is envisioned as working in his shop with all prior art references—which he is presumed to know—hanging on the walls around him as he attempts to solve his problem. *See Robintech, Inc. v. Chemidus Waven, Ltd.*, 450 F.Supp. 823, 833 (D.D.C.1978), *aff'd in part and remanded in part*, 628 F.2d 142 (D.C. Cir.1980). In late 1971, the hypothetical battery technician seeking to produce a charged and dumped battery with extended shelf life would have had hanging before him references to special vent seals, centrifuges, and other processes used to prolong shelf life of such batteries. He also would have had various references to the use of substances such as sodium sulfate in batteries. In many ways, his thought processes as he looked around his shop would have been similar to those of Anthony Sabatino and his fellow workers at their December, 1971 meeting, when they came up with some thirty-two ideas for solving the problems encountered with their Drain Dry batteries.

Would it have been obvious to this hypothetical inventor to push aside the cobwebs hanging from the back corner of his shop and take sodium sulfate down from the wall, where it had sat in disgrace for at least thirty-five years? The Court thinks not. To reach that point, the artisan would have had to push aside a great weight of authority, including a government-sponsored study and a leading textbook, which universally criticized battery "dopes" as ineffective. He would then have had to dust off three references recommending sodium sulfate, none more recent than 1936, and one of which had been expressly discounted in a subsequent textbook. It would not be reasonable to expect one skilled in the art to take this route in solving his problem, unless one were to equate obviousness with "20–20" hindsight.

■ When prior art teaches away from the methods used in a patent, it is relevant and persuasive evidence of the nonobviousness of the patented matter. *See Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d 1047, 1059 (4th Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976) ("the fact that the defendants' prior art references lead away from [the patent in suit], and that even unusually skilled artisans in the field corroborated the negative teachings, is both relevant and persuasive as to the question of non-obviousness"); *W. L. Gore & Associates, Inc. v. Carlisle Corp.*, 529 F.2d 614, 619 (3d Cir. 1976); *Shaw v. E. B. & A. C. Whiting Co.*, 417 F.2d 1097, 1104 (2d Cir. 1969), *cert. denied*, 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811 (1970). Here there are early prior art references teaching the use of sodium sulfate. Nevertheless, the more remote in time the reference, the less likely it becomes that the invention would be obvious to one of ordinary skill. *Wilden Pump & Engineering Co. v. Pressed & Welded Products Co.*, 199 U.S.P.Q. 390, 399 (N.D. Cal.1978), *aff'd in part and rev'd in part*, 655 F.2d 984 (9th Cir. 1981); *cf. Frank W. Egan v. Modern Plastic Machinery Corp.*, 387 F.2d 319, 323 (3d Cir. 1967) ("use in a remote cited art certainly suggests it to be less likely that a person of ordinary skill in the pertinent art would have arrived at the result achieved by the patent in suit"), *cert. denied*, 391 U.S. 966, 88 S.Ct. 2036, 20 L.Ed.2d 879 (1968). As another court has noted:

> We must not here consider a reference in a vacuum, but against the background of the other references of record which may disprove theories and speculations in the reference, or reveal previously undiscovered or unappreciated problems. The question in a § 103 case is what the references would *collectively suggest* to one of ordinary skill in the art.

*Application of Ehrreich*, 590 F.2d 902, 908–09 (Cust. & Pat.App.1979) (emphasis in original). Taking the prior art as a whole, the Court holds that the Drynamic invention

would not have been obvious to one skilled in the art.[25]

## V. § 112—Failure to Disclose Best Mode

GBC argues that the patents should be held invalid because they do not contain such "full, clear, concise and exact terms" to enable one skilled in the art to practice the invention, they do not disclose the "best mode" of practicing the invention, and the claims do not point out or distinctly claim the invention. Section 112 of the Patent Act provides in pertinent part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112. The controversy focuses on the meaning of the terms "dump," drain," and "residual electrolyte" in the patent. It is uncontested that in the manufacture of Drynamic batteries, Gould uses a device known as a "rocker dumper" in the second dump, which rocks the batteries while in an inverted position to remove as much electrolyte as possible from the battery container. GBC contends that the patent does not disclose how much electrolyte must be removed; in particular, GBC alleges that the patent fails to state that the electrolyte must be removed so that it is below the level of the mudrests. GBC further argues that because Gould did not disclose in the patent the necessity of using a mechanical device to rock the batteries, it

failed to disclose the best mode of invention. Further, GBC asserts that the failure of the patent to define "residual electrolyte" renders it invalid.

The patents in suit contain the challenged phrases a number of times. The abstract to the '680 patent (PX6), for instance, notes that "Sufficient electrolyte is removed simply by draining." The patent itself begins by describing conventional means of producing dry charge batteries ('680 patent, col. 1, lines 30–54), and also specifically discusses the Globe Union method of centrifugal force. (Id., col. 1, lines 55–62). The patent then discusses objects of the invention:

> Another object of this invention provides a method for making such batteries which obviates the necessity for using any apparatus or the like to remove all or substantially all of the forming electrolyte from the battery plates or elements.

> Yet another object lies in the provision of a method for making such batteries in which the electrolyte used in forming need only be removed by merely draining the battery container, i.e.—a drain dry battery.

(id., col. 2, lines 9–18). Similarly, in describing the use of the additives, the patent notes:

> This conditioning technique avoids the necessity for completely washing and drying the battery plates or using relatively expensive techniques for removing the electrolyte. Rather, only the electrolyte that can be removed by simply draining the container, e.g.—by inverting and dumping, need be carried out.

(id., col. 3, lines 30–36; see, e.g., col. 3, lines 52–55; col. 4, lines 20–23; col. 5, line 57; col. 6, lines 22–26, 32–33). In the concluding paragraphs, the patent states:

> siderations," Graham v. John Deere, supra, give some further weight to the determination that using sodium sulfate in a charged and dumped battery was not obvious, but the Court stresses that its decision is based primarily on its analysis of the prior art as it would appear to a hypothetical skilled artisan.

**25.** This conclusion is bolstered by evidence presented at trial that previous solutions to the problem—dry charged batteries and Delco maintenance free batteries—were expensive and complicated, and that Gould's Drynamic batteries met with considerable commercial success. (Tr. 175–83). These "secondary con-

754

The invention further provides a drain dry process for forming such batteries which obviates the necessity for drying the battery to remove all the residual formation electrolyte or using relatively complex techniques such as centrifuging to remove most of the electrolyte. Adequate electrolyte is removed simply by draining. The process is versatile and may be used even with batteries whose elements retain up to 50 or 60 volume per cent of the acid added.

(col. 18, lines 24–30; see col. 18, lines 37–40). The patent claims also contain the phrase "residual electrolyte and said battery being otherwise substantially free of electrolyte." (*See* claim 1, col. 19, lines 39–41; claim 2, col. 20, lines 7–8, 11–12; claim 12, col. 20, lines 40, 42–43).[26]

The evidence presented to the Court indicates that Gould knew that the level of electrolyte in Drynamic batteries had to be below the mudrests or rest-ups. At trial, the inventor, Anthony Sabatino, stated: "If the battery is not drained below the rest up, it is not a drain dry battery." [27] (Tr. 330, 333). Gould used a rocker dumper in developing of the Drynamic invention, and Gould inventors strove to get as much acid out as possible in the Drynamic process and product. (*See generally* DX71; DX72; DX85; DX92; DX101; DX106; DX127; Tr. 328–52).

Nevertheless, the more noteworthy fact to emerge at trial was that among those skilled in the art, "dumping" or "draining" a battery means getting as much acid out of the battery as possible; in fact, three of GBC's own witnesses so testified. GBC itself rocked and dumped its batteries in the developing of Redi Dri. (PX4; PX5). John M. Nees, an Assistant to the Vice President of Engineering and Research of GBC, explained that "[w]e were trying to get as much of the electrolyte out of the battery as much as possible so that we wouldn't have any contact of electrolyte in the bottom of the container that would be left over that could possibly cause a short." (Tr. 847). If electrolyte remained in the bottom so that it touched the plates, the battery would be "flooded." Nees defined a "flooded battery" to be one with any electrolyte above the mudrests (Tr. 847–48) and further noted that he had known about that problem in batteries at least since 1970. (Tr. 849). Charles Herb Allen, who had been involved in battery manufacturing since 1930, testified that as part of the Vesta manufacturing process, the batteries were rocked "just to get a little more of the acid out so there wouldn't be too much left in it." (*See* Tr. 1035–36). He further noted that when he first joined Vesta in 1930, it was impressed upon him that batteries had to be drained below the level of the rest-ups or else they would be "no good." (Tr. 1036). Rine Kruger, GBC's technical expert, testified that when he read the patents in suit: "I would drain the electrolyte out to get all that I could out, yes" (Tr. 1189), noting that as one skilled in the art, he would drain so that the electrolyte was beneath the rest-ups. (Tr. 1190).

In the same way, testimony by Gould's witnesses, particularly Anthony Sabatino, indicates that "draining" means getting as much of the electrolyte out as possible. As Sabatino stated in response to a question from the Court: "[W]hen I talk about draining, I'd like to feel—a drain means getting substantially all the acid that will come out by normal gravity means out of the battery." (Tr. 428; *see* Tr. 440). Sabatino explained that the "simply drain" language in the patent was to distinguish from

26. The specifications of the '165 patent (DX7) are virtually identical to those of the '680 patent. The claims specifically refer to "draining" the formation electrolyte or aqueous solution. (*See* '165 patent, claim 1, col. 19, lines 51, 57–58; claim 5, col. 20, lines 14–15, 18–19; claim 6, col. 20, line 31; claim 12, col. 20, lines 56, 62–63; claim 13, col. 21, lines 10–11; col. 22, line 1).

27. Sabatino's testimony appeared to contradict his deposition testimony, where he indicated: "As an example having a battery with the acid below the restups would go three years. And if you had it above the restups it would go two years. Both of them would be completely acceptable products...." (DX314, at 9). Nevertheless, the overwhelming weight of the evidence produced at trial was that draining a battery meant getting the acid level below the rest-ups.

the centrifuge used by Globe Union—"Well, I don't know how much clearer I can get than when I state that if you don't have to centrifuge, that if you simply drain the acid from an element that you can produce a Drynamic product," (Tr. 308) "[a]nd to those skilled in the art, they would drain by appropriate means." (Tr. 320; *see* Tr. 298–323).

In light of this evidence, the Court is of the opinion that one of ordinary skill in the art would know that dumping or draining a battery simply means getting the acid below the level of the mudrests.[28] The patents are not invalid, therefore, for failing to define "dumping," "draining," or "residual electrolyte." In the same way, the fact that Gould uses a rocking apparatus to accomplish the desired result of getting the electrolyte below the level of the mudrests in no way renders the patents invalid. Rocking a battery to get as much electrolyte out as possible was a known process fifty years ago. In short, none of these terms are so imprecise as to constitute a failure to describe the best mode of practicing the invention under Section 112 of the Patent Act.

28. The Court notes with interest that in March of 1978, GBC obtained a patent on an "apparatus for dumping and collecting corrosive substances from automotive batteries," No. 4,081,-093. (DX51). The device provides a mechanism which shakes the batteries, "which shaking helps to dislodge acid from the interstices of the batteries to be dumped." (DX51, col. 3, lines 53–54). The patent points out the need for dumping substances from conventional automotive storage batteries while "ensuring that the batteries themselves are emptied as much as possible so that the higher specific gravity 'finishing acid' is not unduly diluted by the generally lower specific gravity forming acid which is residually retained in the dumped battery." (*Id.*, col. 2, lines 59–63). It is difficult to accept GBC's argument that dumping a battery has some unique meaning in the Drynamic invention when the goal of eliminating excess acid appears to have been clearly recognized in the field.

29. The prosecution history may be described briefly as follows. Two patent applications were filed simultaneously on July 9, 1973—the product and process application on the Drynamic invention, and a related application for vent seals for the Drynamic batteries. The original vent seal application contained five

## VI. *Fraud on the Patent Office*

GBC makes several charges of fraud and inequitable conduct with respect to the prosecution of the Gould patents in the Patent Office. GBC's principal allegation of fraud is that Gould failed to bring the Woodbridge and Petrosky patents to the attention of the Patent Examiner. As discussed *supra*, these patents claimed vent seals for use in charged and dumped batteries; the vent seals permitted gases within the battery to exit without permitting the ingress of air. Evidence was introduced at trial to show that Gould's attorneys became aware of these patents while prosecuting a vent seal application related to the Drynamic patents. GBC asserts that because Gould was aware of this prior art before the issuance of the process patent but failed to present it to the Patent Examiner, it has committed fraud on the Patent Office.

The long and somewhat involved recital of the prosecution history upon which GBC bases its claim is set forth in the margin.[29] GBC essentially argues that the Woodbridge and Petrosky references had resulted in the rejection of certain claims in Gould's vent seal application, and that Gould delib-

claims: claims 1–4 covered the seals, designed to permit internal gases to exit; claim 5 claimed a method for manufacturing drain dry batteries by forming and treating with sodium sulfate and using the vent seals. (*See* DX41, paper 1). In a May, 1974 phone call, Gould's attorney orally agreed to withdraw claim 5 while traversing the Examiner's ruling that claims 1–5 were subject to restriction. Examiner Feeley subsequently rejected claims 1–4 as obvious on June 15, 1974. (*See* DX41, paper 2).

Gould subsequently filed a continuation-in-part of the vent seal application on June 8, 1974. This application contained vent seal claims and two methods which essentially addressed manufacture of a charged and dumped battery with a special vent seal, without claiming the use of sodium sulfate. (DX43, paper 1). On February 18, 1975, Examiner Feeley rejected all eight claims on section 102 and section 103 grounds, apparently on the basis of prior patents which taught this kind of sealing. (*See* DX43, paper 7).

Gould then filed a second continuation-in-part, again including a method claim. (DX57, paper 1). The method claim was in "Jepson" form, claiming an improvement of sealing the batteries with the new vent seals. On Decem-

erately withheld the references from the Examiner assigned to the process patent for fear of the same result. GBC contends that Gould's attempt to insert the references by letter after the prosecution of the patent had closed was too late. Gould acknowledges that its patents have no presumption of validity over Woodbridge and Petrosky, but asserts that these two references were no more relevant than anything already placed before the Patent Examiner.

This Court recently set forth the legal standards for determining fraud on the Patent Office in *Grefco, Inc. v. Kewanee Industries, Inc.*, 499 F.Supp. 844 (D.Del. 1980), *aff'd*, 671 F.2d 495 (3d Cir.), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981):

> ber 11, 1975 eight claims were rejected as obvious; among the references cited by Examiner Feeley were the Woodbridge and Petrosky references. (DX57, paper 2). Gould amended its claims on June 22, 1976 to claim treating with a conditioning quantity of metallic sulfate in claim one. On September 14, 1976, claims 1–8 and 16–17 were rejected. The Examiner rejected claim 1 as obvious because the vents did not structurally distinguish over Petrosky and Woodbridge, and further stated that conditioning with sodium sulfate was the subject of another patent—the copending Mao/Sabatino patent on the Drynamic product and process. Claims 9–15 were allowed. (DX57, paper 8).
>
> In the meantime, Gould's attorneys were prosecuting the product and process application, which had been filed on July 9, 1973. (DX53, paper 1). On May 21, 1974, Examiner Feeley rejected the claims as obvious, citing the Bennett and Cole article (DX3), among other references, to show that adding sodium sulfate was obvious. (DX53, paper 2). Gould filed a continuation-in-part on July 8, 1974; the case was assigned to a different Examiner, Examiner LeFevour. (DX54). In a January 17, 1975 Office Action, claims 12–14, the product claims, were rejected on the grounds that it was obvious to have a battery free of electrolyte and substantially sealed; Gould had withdrawn claims 1–11, the method claim, with oral traverse, on December 3, 1977. (DX54, paper 5). In April 1975, Anthony Sabatino and an attorney for Gould met with the Examiner to advise him that a search of the prior art would be undertaken. (*See* DX54, paper 7). The claims subsequently were amended on June 18, 1975 in response to a January Office Action, adding the phrase "residual electrolyte and said battery being otherwise substantially free of electrolyte and being activatable," and calling a number of other prior art references to the attention of the Examiner, including the Ben-

Kewanee has the burden of proving Grefco's fraud "clearly, unequivocally and convincingly." There are two necessary elements of a finding of fraud. The alleged infringer must first prove that the omission or misrepresentation was "material" in the sense that it made it "impossible for the Patent Office fairly to assess the patent application against the prevailing statutory criteria." Second, the patentee must possess "an affirmative intent to deceive or at least a gross negligence or recklessness in misrepresenting the truth."

*Id.* at 860 (citations omitted).

■ Under this standard, the Court must disagree with GBC's interpretation of

nett and Amlie patents, the 1940 edition of Vinal's textbook, and the NBS study of battery additives. (*See* DX54, paper 9). The Examiner allowed the claims, and the product patent issued on April 6, 1976. It should be noted that at that point, the Woodbridge and Petrosky references had not yet surfaced in the vent seal prosecution.

Gould filed a divisional application on the process patent on October 6, 1975. On April 19, 1976, an informal notice of allowance issued and on May 5, 1976, a formal notice of allowance issued. (*See* DX55, paper 6). Two days later, GBC filed this declaratory judgment action, citing Woodbridge and Petrosky against the patents. Gould sent a letter regarding these references to its Washington, D. C. counsel on June 22, 1976. The letter from Phillip Mayer stated: "The primary intent, obviously, is to make sure that the letter gets into the file regardless of what other action LeFevour might take. Would you make sure that happens?" (DX237). This letter, dated June 30, stated:

> None of this art is believed to negate in any way the patentability of the allowed claims. However, due to the context in which these citations were made, applicants wish to make them of record and request that the Examiner make his own independent evaluation of the relevance or lack thereof.

The letter went on to explain why Gould felt that the references cited by GBC did not affect the patentability of their device; the letter noted that Woodbridge and Petrosky did not teach sodium sulfate, and that the Russian reference contained little free electrolyte. (DX55, paper 9). The letter was acknowledged and made of record in the file on August 10, 1976. (DX55, paper 10). The '165 patent issued on October 26, 1976.

the prosecution history of Gould's patents. Even if Gould's attorneys did become aware at some point before the issuance of its Drynamic patents of the Woodbridge and Petrosky references, the mere failure to cite them to the Patent Examiner does not constitute fraud or inequitable conduct without a showing of the requisite intent. "A patent attorney has no absolute duty to perceive that which one skilled in the art would have perceived if left in a room to study a display of all the prior art. His duty is one of candor and this duty leaves room for the exercise of good faith judgment even if that judgment ultimately is held to have been faulty." *Tokyo Shibaura Electric Co. v. Zenith Radio Corp.*, 404 F.Supp. 547, 570 (D.Del.1975), *aff'd on other grounds*, 548 F.2d 88 (3d Cir. 1977).

In this case, even assuming that Gould's attorneys were aware of the Woodbridge and Petrosky references in time to present them to the Patent Examiner, there is no reason to believe that their failure to cite these references was the result of anything other than good faith judgments that Woodbridge and Petrosky were no more relevant than the prior art before the Examiner. *See Tokyo Shibaura Electric Co. v. Zenith Radio Corp.*, 404 F.Supp. at 570. "[P]atent applicants and their attorneys are not held to an absolute, inflexible duty of disclosure in their dealings with the Patent Office." *Grefco v. Kewanee*, 499 F.Supp. 844, 860 (D.Del.1980). In this case, the Examiner had before him, among other patents, the Halsall patent which clearly disclosed a charged, dumped, and substantially sealed battery. The Woodbridge and Petrosky references disclosed vent seals for charged and dumped batteries. The fact that Gould's vent seal application initially was not patentable over these references did not somehow make them more relevant to the battery application than the prior art before the Patent Examiner. Under the "totality of circumstances," *Monsanto Co. v. Rohm & Hass Co.*, 456 F.2d 592, 600 (3d Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972), the Court finds that the failure to cite the Woodbridge and Petrosky references did not constitute fraud on the Patent Office.

GBC's other allegations of fraud are equally without merit. GBC alleges that Anthony Sabatino withheld from the Patent Examiner his knowledge that charged and dumped batteries had been manufactured after World War II for the Government. (*See* DX39, pp. 54–61; DX235). In light of the Court's holding that the Patent Examiner already had before him references to charged and dumped batteries, this omission does not constitute fraud. In addition, Sabatino's testimony at trial indicates that these batteries were not substantially sealed and that they were difficult to restore to operating condition even after adding electrolyte because they had been exposed to air. (*See* DX39, pp. 57–62; Tr. 426–27).

The remaining allegation is GBC's contention that Gould withheld pertinent test data from the Patent Office. Specifically, GBC charges that Gould knew that Globe Union Spin Dry batteries contained magnesium. GBC offered no live testimony on this issue, and apparently expects the Court to draw inferences from various lab reports and documents introduced into evidence. Two time periods are relevant to this contention. First, in November of 1972, Gould's spectrographic testing of Globe Union batteries apparently revealed the presence of magnesium ions, but no sodium ions. (DX176; DX177; DX178). Anthony Sabatino testified at trial that in the initial phases of the Drain Dry project, Gould had found no additive in the Globe Union batteries. (Tr. 279–80).

The second series of testing occurred during the spring and summer of 1976—months after the product patent had issued and only one month before the method patent issued. James K. Klang, a Gould employee, reported test results which indicated that "[t]he sodium sulfate levels appear to be well within our patent range and are very likely not from chance contamination. From the dates of production, it also appears that Globe has been using sodium sulfate additive for nearly two years."

(DX167, p. 2; DX165; DX166). A subsequent report concluded that "Globe-Union is using a sodium additive in their residual electrolyte at the concentration of about 0.15% equivalent sodium sulfate." (DX168; see DX269 at 20–21). He reported this information to Gould counsel Augustus Hipp. (DX269 at 33).

The Court does not believe that Gould deliberately withheld pertinent test data from the Patent Office. This Court has previously held that omission or misrepresentation of material test results constitutes fraudulent conduct before the Patent Office. *Grefco, Inc. v. Kewanee Industries, Inc.*, 499 F.Supp. at 870. The 1972 test results were inconclusive. The affidavit of Shirley R. Hughes, the technician who performed the analysis, indicates that "magnesium is very responsive to this test, giving clear indications of its presence at concentrations as low as 5 p.p.m. at the range the metal might normally be found in city drinking water." (DX178 p. 2). In the absence of expert testimony, the Court cannot simply conclude from the meager evidence supplied to it that the amount of magnesium found in the 1972 batteries made the test data significant enough to hold its omission fraudulent.

The 1976 test results also suffers from weakness. Gould's characterization of Klang's reported results as "inconclusive test data" (DX179) appears inconsistent with the fact that in 1977–79 Gould moved toward bringing infringement actions against two competitors based on similar test results. (*See* DX145; DX146; DX154; DX155; DX156; DX157; DX158; DX159; DX160; DX162; DX163; DX164). Nonetheless, the Court cannot say on the record before it that GBC has carried its burden of proving fraud "clearly, unequivocally, and convincingly." *Grefco, Inc. v. Kewanee Industries, Inc.*, 499 F.Supp. at 860. The 1976

testing which apparently showed the presence of sodium in a 1971 battery occurred after the prosecution of the patents had closed, and stood in direct contrast to Gould's contemporaneous testing of Globe Union batteries during the development of the Drynamic process. In addition, the 1974–76 batteries were not prior art to the Drynamic invention; to the extent that these batteries contain sodium sulfate, it does not affect the patentability of the invention. The Court must also note that GBC had ample opportunity to develop its theory at trial, as it devoted considerable trial time to the allegations of fraud, but it chose not to introduce any expert testimony to enable the Court to evaluate the testing performed on the batteries or the method used to ascertain the date of manufacture. This evidence may raise some questions, but it does not rise to the level of being "clear, unequivocal, and convincing" so as to warrant a finding of inequitable conduct or fraud on the Patent Office.

■ The Court holds that Gould's '165 and '680 patents are not invalid.

## VII. *Infringement*

■ Having determined that the patents in suit are not invalid, the Court must now decide whether GBC's Redi Dri batteries infringe.[30] The statutory standard for infringement is set forth in Section 271 of the Patent Act: "Except as otherwise provided in this title, whoever without authority makes, uses, or sells any patented invention, within the United States during the term of the patent thereof, infringes the patent." 35 U.S.C. § 271. GBC's contention that it does not infringe Gould's patents focuses on two elements of the Drynamic invention—whether Redi Dri batteries contain "residual electrolyte" as claimed in the patents, and whether they contain sodium sulfate in a "conditioning amount."

---

**30.** Gould offered the testimony of Martin Adelman, a patent lawyer, an expert on patent law to give an opinion as to infringement. To the extent that his testimony was addressed to matters beyond patent office practice and procedure, the Court gives no weight to his evidence. Adelman was not one skilled in the art, nor do his representations as to interpretation of various patent claims help the Court in any way. That interpretation is not a factual question, but rather a matter of law. *See N. V. Maatschappij v. A. O. Smith Corp.*, 590 F.2d 415, 419 (2d Cir. 1978).

Each of these arguments will be addressed in turn.

GBC's argument regarding the presence of "residual electrolyte" hinges, in large part, on its section 112 argument regarding the definition of that term. The Court has already found that "residual electrolyte" is the electrolyte remaining in a battery below the mudrests after it has been dumped. If GBC simply dumps its batteries without using special apparatus to remove more electrolyte than would be removed by dumping and draining as those terms are used in the art, these batteries contain "residual electrolyte" within the meaning of the patents.

GBC described its manufacturing process in its supplemental interrogatory answers. The pertinent part reads:

> The electrolyte is . . . added to the battery and the battery is formed in accordance with conventional "one-shot" forming techniques. . . . To ship them [the batteries] as charged and dumped batteries, they are introduced into an acid dumping apparatus. . . . This apparatus functions by first gripping the batteries, and then rotating them to an inverted position to dump the acid from them. Once the acid is drained, the batteries are returned to their normal upright position. Following this operation, a disposable plastic strip is applied to form a semi-seal over the fill holes of the battery.

(PX46 at 9). No drying process is used on the batteries. The electrolyte remaining in the batteries, therefore, is that remaining after "draining" or "dumping." GBC does not seriously contend that there is no electrolyte remaining in Redi Dri batteries.

Nevertheless, GBC asserts that because it uses special apparatus—a rocker-dumper— to remove electrolyte, it removes more electrolyte than "simply draining." Once again, the Court has already found that using apparatus to rock or shake batteries is within the contemplation of the terms "dump" or "drain" as understood by one of ordinary skill in the art. The patent on GBC's apparatus, Eberle, No. 4,081,093 (DX51) itself indicates that the apparatus is

"a battery dumping apparatus" and the patent specifically described using rubber tires "which cause the tubular members to rotate until bracket stops are engaged by the tires provid[ing] for the additional shaking of the device, which shaking helps to dislodge acid from the interstices of the batteries to be dumped." (DX51, col. 3, lines 50–55). Thus, this device removes the amount of electrolyte contemplated by the patent. GBC's Redi Dri batteries, therefore, contained "residual" electrolyte.

The question of whether sodium sulfate in a "conditioning amount" is present in Redi Dri batteries is somewhat more troubling. GBC's initial contention, made in its post-trial brief, that there is no evidence that its batteries contain sodium sulfate cannot stand in light of its own admission that they do:

> The assembly and formation of General Battery Corporation's charged and dumped batteries do not differ from that used by General Battery Corporation to manufacture its wet battery production. The batteries are formed in a "one-shot" process using an electrolyte having a specific gravity in the range from about 1.210 to 1.240 to which between 30 and 40 grams per liter of sodium sulfate has been added, that is, the additive is approximately 3% by weight of the formation electrolyte. In preparing the electrolyte sodium sulfate is added to the electrolyte in the appropriate proportions mixed according to conventional techniques until the sodium sulfate is fully dissolved. The electrolyte is then added to the battery and the battery is formed in accordance with conventional "one-shot" forming techniques.

(PX46; see also Tr. 679–81, 687–89, 787–88, 790, 798). GBC currently uses 2.5% sodium sulfate in its Redi Dri batteries. (Tr. 790–92; DX288, p. 2; PX111).

GBC contends that the amount of sodium sulfate used in its batteries is greater than a "conditioning amount" and that it therefore cannot be considered an infringement of the patents in suit. Although the claims alleged to be infringed do not contain a

percentage, GBC looks to the specifications to define the term "conditioning amount," and argues that the specifications limit the percentage of sodium sulfate to "no greater than about 2 percent or less." GBC further asserts that because no evidence was introduced at trial to indicate that 2½ percent is equivalent to 2 percent, its batteries cannot be held to infringe the patent. The Court does not accept GBC's reading of the patent.

It is an oft-stated principle that "[i]n determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." *Graver Tank and Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). Before turning to the specifications to determine the meaning of an ambiguous term, "[a] Court should consider how ambiguous the claimed ambiguity really is, and how difficult a task it would have been to make the claim read literally what it is urged to mean by reference to the specification." *Mueller Brass Co. v. Reading Industries, Inc.*, 352 F.Supp. 1357, 1363 (E.D.Pa.1972), *aff'd* 487 F.2d 1395 (3d Cir. 1973). Here, the term "conditioning amount" is not defined in the claims alleged to be infringed,[31] and resort must be had to the specifications.

GBC relies heavily on language in the patent which limits the amount of additive to be used when the additive is used during formation. That language reads:

> In accordance with another embodiment of the present invention, the conditioning agent can be applied during the formation step.... It has been found suitable in this embodiment to include *no more than about 2 per cent or less* by weight of the formation acid. Further processing then involves draining the formation acid and rinsing, if desired, (with or without addition of further

treating agent), followed by draining the rinse solution and then sealing the battery as before.

'165 patent, col. 6, lines 16–28. Two paragraphs later, however, the patent notes:

> Regardless of the process step in which the treating acid is added, it is important that the amount be sufficient to provide the minimum conditioning required, i.e., —that amount sufficient to substantially prevent internal shorts between the battery plates that cause irreversible damage to the performance of the battery.

Col. 6, lines 50–55. The paragraph further states that the amount depends on the step where the agent is added, the amount of dilution, and the specific treatment. The next paragraph is even more damaging to GBC's reading of the specifications:

> *Increased amounts of treating agent, well above the minimum (i.e.—up to about 5% by weight of the solution), can also be suitably used.* However, the amount employed should not be so excessive as to significantly adversely affect the battery performance. The battery reserve capacity and cold performance can particularly be affected by excessive amounts of treating agent. Moreover, if the treating agent is added with the formation acid, excessive amounts can impair the ability to reach the desired end-of-charge voltage. The maximum tolerable amount can vary somewhat, depending upon the specific treating agent employed.

(Col. 7, lines 1–10, 30–34 (emphasis added)).

The Court "must juxtapose the claims of the patent and the accused product within the overall context of the claims and specifications, to determine whether there is exact identity of all material elements." *Johnson & Johnson v. W. L. Gore & Associates, Inc.*, 436 F.Supp. at 728. The question to be answered is "whether a person skilled in the art would read the claim of the patent to contemplate a range which includes the accused patent." *Id.* As already

---

**31.** Claim 3 of the '680 patent does describe "a conditioning amount of a soluable metallic sulfate sufficient to prevent crystal growths and clusters extending between adjacent positive and negative plates." ('680 patent, col. 20, lines 8–11).

noted, the percentage limitations appear nowhere in the claims alleged to be infringed. One reading the claims of the patent within the overall context of the claims and specifications reasonably would conclude that a "conditioning amount" of metallic sulfate could embody up to five percent additive. GBC's use of two-and-a-half percent sodium sulfate clearly falls within this range.

The Court holds that GBC's Redi Dri batteries infringe the patents in suit.

## VIII. *Exceptional Case*

Although the damages issue was bifurcated from the trial on the merits, the Court will address one issue relating to the amount of recovery. In certain unusual circumstances, a prevailing party may be entitled to attorney's fees and increased damages. Section 284 of the Patent Act provides in pertinent part that "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Section 285 further provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Gould contends that this is just such an "exceptional case," entitling it to an additional award.

Gould's contention that this is an exceptional case is based on two principal assertions: 1) that GBC "stole" the Drynamic process from Gould, and 2) that GBC falsely asserted that its own Redi Dri process had been the product of the Russian reference discussed *supra* at pages 747–748, which John Nees, a GBC employee, had brought with him when he left his job at National Lead. Gould argues that this copying of its invention constitutes willful infringement, and that improperly urging the Russian reference unnecessarily prolonged the litigation.

GBC conceded at trial that it had received its information about Gould's Drynamic process "improperly." (Tr. 719). In July or August of 1974, Keith Lund, a GBC employee, had contacted a friend at Gould, his former place of employment, and had obtained information regarding the Drynamic batteries and forty or fifty vent caps.

Mr. Pace, GBC's Vice President of Manufacturing, ultimately received the information, and this acquisition led to the development of GBC's Redi Dri batteries. (*See* Tr. 694–95, 719, 807–10; PX132 at 12–13, 15–17, 23–24, 26; PX133 at 14–15, 18). GBC made efforts to keep its project secret within the company by mislabelling the sodium sulfate additive. (*See* Tr. 788–90; PX109). Pressure from Alabama environmental officials regarding effluent problems with GBC's dry-charge facilities (*see generally* Tr. 730–64) and commercial pressure from Globe Union and Gould's Drynamic battery (Tr. 655, 674–75, 679–81) were incentives to GBC's development of a competitive product.

In addition, GBC abandoned its long-held position that the Redi Dri process was developed from the Russian reference (DX7) brought to GBC by John Nees. At trial, the following exchange occurred between John Nees and Gould's counsel, Phillip Mayer:

Q: In the pretrial order, there's a brief statement of what GBC expects to prove. There's a statement, Mr. Nees, that General based its defense on a single prior art reference, the Russian reference, that is just not true, is it?

A: No.

The Court: No, you mean it is not true?

A: No, it isn't.

(Tr. 810–11; *see* Tr. 769). GBC offered little explanation for this inconsistency, and in fact urged in its post-trial brief that "the process ultimately adopted by GBC was derived from a separate testing program ... based on a prior art reference brought to GBC by Mr. Nees from National Lead Co." (General's Post-Trial Memorandum, Substitute Copy, Docket No. 253B at 121).

The Court holds that this conduct so "grossly disregarded" the rights of Gould that it constitutes willful infringement by GBC of Gould's patents. *See W. L. Gore & Associates, Inc. v. Carlisle Corp.*, 205 U.S. P.Q. 507, 512 (D.Del.1979). There is no evidence of any good faith belief by GBC

that the patents were invalid; nothing in the record indicated an "honest doubt" as to the validity of the patent in suit.[32] GBC deliberately appropriated the Drynamic invention and then attempted to conceal this improper activity by arguing that its Redi Dri process was derived from the Russian reference, even though it knew that this was not the case. *See Milgo Electronics Corp. v. United Business Communication,* 623 F.2d 645, 665–66 (10th Cir.) (per curiam), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980).

The Court will not determine now whether to increase damages or award attorney's fees, a matter placed within its discretion. *ADM Corp. v. Speedmaster Packaging Corp.,* 525 F.2d 662, 664 (3d Cir. 1975). If the parties cannot agree on the amount of damages, the Court will decide this issue when it conducts the damages phase of this trial. The Court notes for the present time that this litigation has consumed nearly six years, engendering much needless expense and wasting considerable time for the litigants and the Court. Both sides have been involved in repeated discovery disputes and constant bickering over anything conceivably at issue, including some items that ordinary mortals would not believe could engender dispute.[33] The Court can only echo the words of another district court in this Circuit:

> It is also true that both parties made charges against the other for harassing them in this case. It is claimed that the defendant has unnecessarily insisted on fraud on the Patent Office, that the matter has long been foreclosed and both sides claim obstruction of discovery by the other. The court determines that both sides have been guilty of such obstructions resulting in unnecessary argu-

ments before the court. It is difficult to sort out the blame on this problem and the court concludes it is a case of the pot calling the kettle black.

*Universal Athletic Sales Co. v. American Gym,* 480 F.Supp. 408, 415 (W.D.Pa.1979) (Knox, J.). The Court will set out these circumstances in more detail at some future time should it prove necessary to do so. For the time being, the Court holds that GBC willfully infringed Gould's patents, but reserves to another day the decision of how much, if at all, the damages should be increased or attorney's fees should be awarded.

An order will issue in accordance with this Opinion.

---

**32.** At a hearing before the Alabama Water Improvement Commission, GBC's Vice President of Manufacturing Services, John Bitler, stated while describing how the Redi Dri process would remedy its pollution problems: "There are problems. There are patent problems because we admit that some of these ideas are not always ours. The industry does exchange information by the exchange of people. So, we are in the process of looking for the new ap-

proach this way." (PX85 at 51). This statement casts doubt on any assertion that GBC was unaware of potential infringement with its Redi Dri process.

**33.** As an example, the Court merely notes for the record that in the Pre Trial Order governing this action the parties could not agree on the definition of a battery. (*See* PTO 3(a)(1)1; 3(b)(1)1).